FELICE JOHN VITI, Acting United States Attorney (#7007)
BRYAN R. WHITTAKER, Assistant United States Attorney (#16764)
JONATHAN STOWERS, Assistant United States Attorney (#16374)
Office of the United States Attorney
111 South Main Street, Suite 1800
Salt Lake City, Utah 84111-2176
Telephone: (801) 524-5682

TANYA SENANAYAKE, Trial Attorney (DC#1006218)
Counterterrorism Section
National Security Division
U.S. Department of Justice
950 Pennsylvania Avenue, N.W.
Washington, D.C. 20530
(202) 514-0849

Attorneys for the United States of America

## IN THE UNITED STATES DISTRICT COURT
## DISTRICT OF UTAH

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>        Plaintiff,<br><br>    vs.<br><br>MARCEL MALU MALANGA,<br>TYLER CHRISTIAN THOMPSON, JR.,<br>BENJAMIN REUBEN ZALMAN-<br>POLUN, and<br>JOSEPH PETER MOESSER.<br><br>        Defendants. | Case No.: 2:25-mj-00346 DBP<br><br><br><br>UNITED STATES' MOTION<br>SEEKING DETENTION<br><br><br><br>Magistrate Judge Dustin B. Pead |

The United States moves for detention of Defendants Marcel Malu Malanga
("MALANGA"), Tyler Christian Thompson, Jr. ("THOMPSON"), Benjamin Reuben
Zalman-Polun ("POLUN"), and Joseph Peter Moesser ("MOESSER") based on the

information available at the present time. The United States's positions in this preliminary pleading could change after reviewing the Pretrial Report or learning of additional evidence. The United States reserves the right to assert positions even if the boxes next to those positions are not checked below, raise additional arguments, and file additional pleadings in support of detention.

Part I primarily addresses the statutory detention factors under 18 U.S.C. § 3142(e) and (f)(1). Part II more specifically addresses the detention factors under 18 U.S.C. § 3142(g). As discussed below, the release of the defendants would endanger the safety of other persons and the community, and the defendants pose a serious flight risk. There are no conditions or combination of conditions that could be imposed that would assure the defendants' appearance.

## PART I: Statutory Detention Factors

The United States' motion for detention is:

☒ Pursuant to 18 U.S.C. § 3142(f)(1) because defendant is charged with:

    ☐ **(A)** a crime of violence (*see* 18 U.S.C. § 3156(a)(4)), a violation of 18 U.S.C. § 1591 (sex trafficking of children), or an offense under § 2332b(g)(5)(B) (specific enumerated crimes) for which a maximum term of imprisonment of 10 years or more is prescribed; **or**

    ☒ **(B)** an offense for which the maximum sentence is life imprisonment or death; **or**

    ☐ **(C)** an offense for which a maximum term of imprisonment of 10 years or more is prescribed in the Controlled Substances Act (21 U.S.C. §§ 801-904), the Controlled Substances Import and Export Act (21 U.S.C. §§ 951-971), or Chapter 705 of Title 46, U.S.C. (46 U.S.C. §§ 70501-70508); **or**

    ☐ **(D)** any felony if the defendant has been convicted of two or more offenses described in (a) through (c) above, or two or more State or local offenses that would have been offenses described in (a) through (c) above if a circumstance giving rise to Federal jurisdiction had existed, or a combination of such

offenses; **or**

☒ **(E)** any felony that is not otherwise a crime of violence but involves: **(i)** a minor victim; **(ii)** the possession or use of a firearm or destructive device (as defined in 18 U.S.C. § 921); **(iii)** any other dangerous weapon; or **(iv)** a failure to register under 18 U.S.C. § 2250;

**OR**

☒ Pursuant to 18 U.S.C. § 3142(f)(2) because the case involves:

☒ **(A)** a serious risk the defendant will flee; **or**

☐ **(B)** a serious risk the defendant will obstruct or attempt to obstruct justice, or threaten, injure, intimidate, attempt to threaten, injure or intimidate a prospective witness or juror.

### Procedure

The defendant may seek a continuance of the detention hearing of up to five days, and the United States may seek a continuance of up to three days. 18 U.S.C. § 3142(f). During any such continuance, the defendant shall be detained. *Id*. The rules concerning the admissibility of evidence do not apply at the detention hearing. *Id*. The United States has the burden of persuasion by clear and convincing evidence that no condition or combination of conditions of release will reasonably assure the safety of any other person and the community or by a preponderance of evidence that no condition or combination of conditions of release will reasonably assure the defendant's appearance as required. *Id*.; *United States v. Cisneros*, 328 F.3d 610, 616 (10th Cir. 2003).

### Rebuttable Presumption

☒ A rebuttable presumption applies and the defendant bears the burden to produce some credible evidence to rebut this presumption. The United States acknowledges that it retains the burden of persuasion. The statutory presumption applies:

☐ Pursuant to 18 U.S.C. § 3142(e)(2) *(previous violator)*: There is a rebuttable presumption that no condition or combination of conditions will reasonably assure the safety of any other person and the community because:

**(A)** the defendant has previously been convicted of a Federal offense that is described in 18 U.S.C. § 3142(f)(1), or of a State or local offense that would have been such an offense if a circumstance giving rise to Federal jurisdiction had existed; *and*

**(B)** the defendant committed that offense while on release pending trial for

a Federal, State, or local offense; ***and***

    **(C)** a period of not more than five years has elapsed since the date of conviction, or the release of the defendant from imprisonment, for that, whichever is later.

☒ Pursuant to 18 U.S.C. § 3142(e)(3) *(narcotics, firearm, other offenses)*: There is a rebuttable presumption that no condition or combination of conditions will reasonably assure the appearance of the defendant as required and the safety of the community because there is probable cause to believe that the defendant committed one or more of the following offenses:

    ☐ **(A)** an offense for which a maximum term of imprisonment of 10 years or more is prescribed in the Controlled Substances Act (21 U.S.C. §§ 801-904), the Controlled Substances Import and Export Act (21 U.S.C. §§ 951-971), or Chapter 705 of Title 46, U.S.C. (46 U.S.C. §§ 70501-70508);

    ☒ **(B)** an offense under 18 U.S.C. §§ 924(c), 956(a), or 2332b;

    ☒ **(C)** an offense listed in 18 U.S.C. § 2332b(g)(5)(B) for which a maximum term of imprisonment of 10 or more is prescribed;

    ☐ **(D)** an offense under Chapter 77 of Title 18, U.S.C. (18 U.S.C. §§ 1581-1597) for which a maximum term of imprisonment of 20 years or more is prescribed; **or**

    ☐ **(E)** an offense involving a minor victim under 18 U.S.C. §§ 1201, 1591, 2241, 2242, 2244(a)(1), 2245, 2251, 2251A, 2252(a)(1), 2252(a)(2), 2252(a)(3), 2252A(a)(1), 2252A(a)(2), 2252A(a)(3), 2252A(a)(4), 2260, 2421, 2422, 2423, or 2425.

## Factors to Be Considered

The United States may present arguments, proffer evidence, or provide testimony at the scheduled detention hearing supporting the detention of the defendant including, but not limited to:

☒ The nature and circumstances of the offense charged, including whether the offense is a crime of violence, a violation of section 1591, a Federal crime of terrorism, or involves a minor victim or a controlled substance, firearm or destructive device. (18 U.S.C. § 3142(g)(1)).

☒ The weight of evidence against the defendant. (18 U.S.C. § 3142(g)(2)).

☒ The history and characteristics of the defendant including the defendant's character, physical and mental condition, family ties, employment, financial resources, length of residence in the community, community ties, past conduct, history relating to drug or alcohol abuse, criminal history and record

concerning court proceedings. (18 U.S.C. § 3142(g)(3)(A)).

☐ Whether, at time of the current offense or arrest, the defendant was on probation, parole, or other release pending trial, sentencing, appeal, or completion of sentence for an offense under Federal, State, or local law. (18 U.S.C. § 3142(g)(3)(B)).

☒ The nature and seriousness of danger to any person or to the community that would be posed by the defendant's release. (18 U.S.C. § 3142(g)(4)).

☐ The defendant's lack of legal status in the United States. The defendant's legal status is:

☐ How the defendant would be subject to removal or deportation after serving a period of incarceration.

☒ The defendant's significant family or other ties outside of the United States.

☐ The defendant's use of aliases or false documents.

☒ The defendant's prior attempts to evade law enforcement.

☐ How the defendant's proposed residence, employment, or proposed treatment programs have not been verified.

☐ The defendant's prior failures to appear for court proceedings.

☒ Other reasons including: The United States will file a separate Brief in Support of its Motion for Detention.

### Victim Notification

☐ The United States has notified any identified victim, or attempted to do so, pursuant to 18 U.S.C. § 3771.

The position of the victim(s) on the detention of the defendant is:

☐ The victim(s) in this matter seek(s) a no contact order.

☒ This matter does not involve a victim requiring notification.

### PART II:  The detention factors show that the Defendants should be detained pending trial.

Defendants Marcel Malu Malanga ("MALANGA"), Tyler Christian Thompson, Jr. ("THOMPSON"), Benjamin Reuben Zalman-Polun ("POLUN"), and Joseph Peter Moesser ("MOESSER") wanted change in the Democratic Republic of the Congo

5

("DRC"). Rather than seeking to bring about peaceful change in the DRC, however, the defendants planned, facilitated, and carried out a brutal and violent attack in that country. The defendants conducted an armed military operation ("Armed Coup Attack") specifically targeting DRC President Félix Tshisekedi and Deputy Prime Minister for the Economy Vital Kamerhe ("Kamerhe"), attacking both the Palais de la Nation, which is the official residence and principal workplace of the president, and Kamerhe's private residence in Kinshasa, DRC. Men wearing camouflage fatigues and armed with weapons attacked and entered the Palais de la Nation. Armed men also attacked Kamerhe's residence, which was riddled with bullet holes after the attack. At least six people died during the attack, including two police officers who were protecting Kamerhe's residence, and at least one innocent bystander.

Ultimately, the defendants sought to use violence—bombs and bullets—in a foreign country to effect change. The defendants planned for the Armed Coup Attack; recruited others to join, some for large sums of money; procured from businesses and private parties military equipment to include firearms, ammunition, uniforms, communications equipment, and communications jamming equipment; arranged for the transport of explosives, weapons, and resources from the United States to the DRC, and did transport weapons and resources to Africa, for use in the Armed Coup Attack; and took other planning and preparatory steps here in Utah and elsewhere in the United States.

The four defendants pose an extreme danger to the community and present an unmanageable risk of flight. Therefore, they should be detained pending trial.

## <u>LEGAL STANDARD</u>

The Bail Reform Act (BRA), 18 U.S.C. § 3141, *et seq.*, sets forth the rules governing pretrial detention in federal court.

## I.    ELIGIBILITY FOR DETENTION

Under the BRA, if the United States moves to detain a defendant, a detention hearing "shall" be held if the case involves a charged offense falling in one of five enumerated categories, 18 U.S.C. § 3142(f)(1)(A)–(E), or if the defendant poses a serious risk of flight or of attempting to obstruct justice or threaten, injure, or intimidate a witness or juror, *id*. § 3142(f)(2)(A)–(B). The required detention hearing "shall be held immediately upon the person's first appearance before the judicial officer unless that person, or the attorney for the Government, seeks a continuance." *Id*. § 3142(f)(2).

## II.    SECTION 3142(G) FACTORS

The Bail Reform Act provides four factors to guide a court's determination as to whether a defendant is a flight risk or a danger to the community: (1) the nature and circumstances of the offense charged; (2) the weight of the evidence against the defendant; (3) the defendant's history and characteristics; and (4) the nature and seriousness of the danger to the community posed by the defendant's release. 18 U.S.C. § 3142(g).

A judge "shall order" the "detention of the [defendant] before trial," if, after a detention hearing held under 18 U.S.C. § 3142(f), and upon consideration of "the available information concerning" the four enumerated factors, *id.* § 3142(g), "the judicial officer finds that no condition or combination of conditions will reasonably assure the appearance of the person as required and the safety of any other person and the community," *id.*

§ 3142(e)(1). "In common parlance, the relevant inquiry is whether the defendant is a 'flight risk' or a 'danger to the community.'" *United States v. Vasquez Benitez*, 919 F.3d 546, 550 (D.C. Cir. 2019). "[T]he government bears the burden of showing by a preponderance of the evidence that the defendant poses a flight risk, and by clear and convincing evidence that the defendant poses a danger to the community." *United States v. Gebro*, 948 F.2d 1118, 1121 (9th Cir. 1991).

## ANALYSIS

## I.    THERE IS A PRESUMPTION OF DETENTION IN THIS CASE

The procedures governing the release or detention of a defendant pending trial are described in 18 U.S.C. § 3142. When a "judicial officer finds that no condition or combination of conditions will reasonably assure the appearance of the person as required and the safety of any other person and the community," the judicial officer shall order that the defendant be detained before trial. 18 U.S.C. § 3142(e)(1).

Section 3142 creates a presumption "that no condition or combination of conditions will reasonably assure the appearance of the person as required and the safety of the community if the judicial officer finds that there is probable cause to believe that the person committed" specified enumerated offenses, such as an offense under 18 U.S.C. 956(a), or an offense listed in 18 U.S.C. § 2332b(g)(5)(B) and which carries a maximum term of imprisonment of 10 years or more. 18 U.S.C. § 3142(e)(3)(B), (C). "Once the presumption is invoked, the burden of production shifts to the defendant." *United States v. Stricklin*, 932 F.2d 1353, 1354 (10th Cir. 1991). "However, the burden of persuasion regarding risk-of-flight and danger to the community always remains with the government." *Id*. at 1354–

55. "Even if a defendant's burden of production is met, the presumption remains a factor for consideration by the district court in determining whether to release or detain." *Id.* Ultimately, "the presumption reflects Congress's substantive judgment that particular classes of offenders should ordinarily be detained prior to trial." *United States v. Stone*, 608 F.3d 939, 945 (6th Cir. 2010) (affirming finding of detention where defendant had been charged with attempt to use weapons of mass destruction, in violation of 18 U.S.C. § 2332a(a)(2), among other charges).

Here, a presumption for detention exists because the defendants were charged by criminal complaint for, *inter alia*, conspiring to provide material support and resources, in violation of Title 18, United States Code, Section 2339A; conspiring to use weapons of mass destruction, in violation of Title 18, United States Code, Section 2332a(b); and conspiring to bomb government facilities, in violation of Title 18, United States Code, Section 2332f(a)(2).[1] These offenses are enumerated in 18 U.S.C. § 2332b(g)(5)(B), and they each carry a maximum term of imprisonment of more than ten years. *See* 18 U.S.C. § 3142(e)(3)(C). In fact, based upon the criminal complaint, the defendants face a maximum penalty of up to fifteen years for conspiring to provide material support and

---

[1]   The defendants were charged by criminal complaint, and the court issued arrest warrants for the defendants on the basis of the complaint. As such, a magistrate judge found probable cause that the defendants committed the offenses charged. *See United States v. Chimurenga*, 760 F.2d 400, 404-05 (2d Cir. 1985) ("The plain language of the statute and the legislative history shows that the presumption [of detention] was intended to arise only after a defendant has been charged with the particular offense by a valid complaint or indictment.").

resources; and up to life imprisonment for conspiracy to use weapons of mass destruction and conspiracy to bomb places of government facilities.

Further, a presumption for detention applies where, as here, the defendants were charged with conspiring to kill or kidnap persons in a foreign country, in violation of Title 18, United States Code, Section 956(a). *See* 18 U.S.C. § 3142(e)(3)(B).

The defendants cannot overcome the presumption of detention. In light of the factors set forth in 18 U.S.C. § 3142(g), addressed below, there are no conditions of release that will reasonably assure the safety of the community or the appearance of the defendants as required.

## II.    ANALYSIS OF SECTION 3142 FACTORS

Based on an individualized evaluation of the defendants, each of the four factors outlined in Section 3142(g) counsel in favor of detention in this case.

### A.    The Defendants Should Be Detained Because They Are a Danger to the Community

These defendants should be detained because, as the United States shows with clear and convincing evidence, they pose an extreme danger to the community. As described above, the defendants conducted an armed military operation that targeted DRC President Tshisekedi and Deputy Prime Minister for the Economy Kamerhe. The defendants planned this brutal attack, and MALANGA, THOMPSON, and POLUN traveled to Africa to effectuate these violent plans, attacking both the Palais de la Nation, the official residence and principal workplace of the DRC president, and Kamerhe's private residence in Kinshasa, DRC. Men wore camouflage fatigues and, armed with weapons, attacked and

entered the Palais de la Nation. Armed men also attacked Kamerhe's residence, which was riddled with bullet holes after the attack.

Christian Malanga, MALANGA's father, acted as a leader and organizer of these rebel forces. It was the intent of these rebel forces to topple the DRC government and to murder President Félix Tshisekedi, Kamerhe, and others, with the goal of installing Christian as the new president of the DRC. MALANGA held himself out as a leader of the rebel forces and identified himself as the "Chief of Staff of the Zaire army." POLUN was Christian Malanga's chief of staff. MOESSER was the explosives maker, explosives technician, and explosives supplier. THOMPSON was a soldier and a drone specialist/operator for the Armed Coup Attack.

The defendants' conduct, and the conduct of the members of the conspiracy, was violent and brutal: During the Armed Coup Attack, six individuals, including one innocent bystander, were brutally murdered. These defendants fall within the category of the most dangerous criminals in our society—those who will murder to achieve their objectives. *See, e.g., United States v. Cisneros*, 328 F.3d 610, 619 (10th Cir. 2003) ("In the eyes of the law, there are very few charges more serious than a charge of murdering prospective witnesses because that conduct undermines the very fabric of our rule of law."); *United States v. Robertson*, 852 F. App'x 331, 340 (10th Cir. 2021) (unpublished) (shooting at victim eight times, even though victim did not die, was strong evidence supporting finding that defendant was a danger to the community).

The defendants and other members of this conspiracy planned to take—and did in fact take—human life, and thus the defendants should be detained as a danger to the

community. *See, e.g.*, *United States v. Orena*, 986 F.2d 628, 628 (2d Cir. 1993) (defendants to be detained pending trial because they were a danger to the community where they had been indicted on RICO charges based on predicate acts of murder, conspiracy to murder, loansharking and illegal possession of weapons).

The Criminal Complaint details the coconspirators' plans to kill in order to accomplish their objective of toppling a foreign government. The United States incorporates the allegations in the Complaint here, as the Complaint details the defendants' conduct that reflect how each defendant poses a serious danger to the community. For ease of reference, the United States briefly describes some of defendants' conduct below.

The defendants researched, planned to acquire, and did acquire weapons and devices to kill others in furtherance of the Armed Coup Attack. For instance, MALANGA corresponded with an individual claiming to work with a foreign military about drones and "shells used for air strikes." MALANGA also attempted to acquire hornet drones and shells that could be dropped from a drone. MALANGA and THOMPSON researched and shopped for drones and drone attachments, including a TF-19 Wasp Flamethrower. Then MALANGA traveled from Utah to California to purchase a DJI S1000 drone that was to be used in the Armed Coup Attack; after this purchase, THOMPSON and another individual picked up this drone from the Salt Lake City International Airport. MALANGA and THOMPSON also acquired a second drone, a DJI Mavic 2, that was to be used in the Armed Coup Attack. THOMPSON conducted test flights with the DJI Mavic 2 drone, and both THOMPSON and MALANGA attempted to conduct test flights with the DJI S1000 drone. MALANGA then purchased a TF-19 Wasp Flamethrower drone attachment, and

MALANGA, THOMPSON, MOESSER, and a coconspirator practiced installing the TF-19 Wasp Flamethrower attachment to the DJI S1000 drone at MOESSER's residence located in West Valley City, Utah.

The defendants took additional steps in planning to kill others during their Armed Coup Attack on the DRC government. MALANGA, THOMPSON, and MOESSER met together at MOESSER's residence in Utah, where MOESSER demonstrated and provided training and instruction to them on how bombs and destructive devices worked. When leaving for Africa, on or about April 10, 2024, MALANGA and THOMPSON possessed and carried an XDE Smith & Wesson .45 caliber firearm, and a 1911 Firestorm .45 caliber firearm, respectively, from the United States to Africa. Further, MALANGA and coconspirators spoke about the Armed Coup Attack as "taking out terrorists" and engaging in "Call of Duty" conduct in the DRC. Call of Duty is a first-person military shooter video game known for its realistic and intense violence, including depictions of shooting, gunshot wounds, blood, gore, dismemberment, exposed viscera, and stabbings.

The serious nature of defendants' conduct and their desire to commit extreme physical violence underscore that these defendants clearly are a danger to the community. The defendants, along with coconspirators, conspired to murder and kidnap others. They planned the murder of the president of a foreign county, as well as other officials in the government of the DRC. And they planned to kill anyone who stood in their path during the Armed Coup Attack. They further conspired to provide, and did each provide, material support and resources in order to accomplish their goals to overthrow the DRC government. They carefully planned out their violent attack for months beforehand, and

they conducted much of this planning and preparation from within the District of Utah. They scouted victims and locations for the attack beforehand. They recruited others to join. They trained with firearms, both in Utah and in Africa, before the Armed Coup Attack, and then they used firearms in the attack, including assault rifles such as AK-47 and Uzis. They conspired to manufacture and use destructive devices; intended to use explosives with shrapnel and buckshot to make those devices more lethal; and planned to utilize these bombs by dropping them from the air. They planned and conspired to use a flamethrower to light people on fire. Their targets included DRC government officials and other people, private residences, and public buildings.

Defendants may try to argue that there is no evidence they would injure another person if they were now released pending trial. But such an argument does not overcome their prior violent conduct. *Cisneros*, 328 F.3d at  619 ("Although the government obviously cannot prove that Cisneros would in fact injure another individual or the community if she were released pending trial, it has presented clear and convincing evidence that she is an identified and articulable threat based upon the prior conduct of the Cisneros Organization, [including among other things murder,] and her involvement with that organization.").

The whole of defendants' conduct evinces a total disregard and indifference for human life. The defendants have been charged with, and did commit, multiple counts of some of the most serious offenses under United States criminal code. The evidence overwhelming shows they are a danger to the community and should be detained.

### B.    Nature and Circumstances of the Offenses Charged

Section 3142(g) instructs this Court to consider "the nature and circumstances of the offense charged, including whether the offense is a crime of violence, a violation of section 1591, a Federal crime of terrorism, or involves a minor victim or a controlled substance, firearm, explosive, or destructive device." 18 U.S.C. § 3142(g)(1). These categories, in Congress's judgment, capture "the most serious of crimes." *United States v. Salerno*, 481 U.S. 739, 747 (1987).

A "Federal crime of terrorism" is an "offense that is calculated to influence or affect the conduct of government by intimidation or coercion, or to retaliate against government conduct"; and is a violation of, *inter alia*, 18 U.S.C. §§ 956(a)(1) (relating to conspiracy to murder, kidnap, or maim persons abroad); 2332a (relating to use of weapons of mass destruction); 2332f (relating to bombing of public places and facilities); and 2339A (relating to providing material support and resources). 18 U.S.C. § 2332b(g)(5). Here, MALANGA, THOMPSON, POLUN, and MOESSER were charged with the above four offenses. Further, the charges under §§ 2332a and 2332f involve "explosives" or "destructive devices." *See* 18 U.S.C. § 3142(g)(1). Additionally, MALANGA and THOMPSON were each charged with 18 U.S.C. § 924(k)(2), which involves firearms, specifically, taking firearms out of the United States to engage in a felony. *See id*. Moreover, MOESSER provided at least one firearm to other members of the conspiracy for use during the Armed Coup Attack, and he conspired together with the other defendants to bring a firearm (a sniper rifle) to the DRC to use during the Armed Coup Attack. The

FBI recovered that sniper rifle during a lawful search of MOESSER's residence, located in Utah.

DRC authorities, responding to the Armed Coup Attack, arrested MALANGA, THOMPSON, and POLUN in the DRC. These three defendants were convicted after proceedings in the DRC, and then they were detained by DRC authorities. On April 8, 2025, the DRC released MALANGA, THOMPSON, and POLUN into U.S. custody. These three defendants were arrested pursuant to the arrest warrants issued by this Court for the charges filed in this case (Case No.: 2:25-mj-00346 DBP). These three defendants are not being held in custody in the United States pursuant to any term of imprisonment or sentence imposed by the DRC government. Thus, if the defendants are now released, they would be able to, and likely would, flee, given the serious charges they now face in this case in the United States.

When a defendant faces a probable very lengthy term of imprisonment, there is a great incentive to flee. *United States v. Nichols*, 897 F. Supp. 542, 547 (W.D. Okla. 1995), *aff'd* 1995 WL 430191 (10th Cir. July 21, 1995) ("The prospect of a lengthy prison term, life imprisonment or the death penalty provides Defendant with a great incentive to flee."); *United States v. El–Gabrowny*, 35 F.3d 63, 65 (2nd Cir.1994); *United States v. Abad*, 350 F.3d 793, 799 (8th Cir. 2003) (finding that facing a potential maximum of thirty years' imprisonment is strong evidence of incentive to flee).

In sum, the nature of the charged offenses weighs heavily in favor of detention.

### C.    The Weight of the Evidence Shows Defendants Should be Detained

"The weight of the evidence has the least force in the court's analysis, in recognition of the presumption of innocence that attaches to [a] defendant at the pretrial stage of a criminal proceeding." *United States v. Keeton*, 457 F. Supp. 3d 855, 859 (E.D. Cal. 2020), *aff'd*, No. 20-10162, 2020 WL 4805479 (9th Cir. June 17, 2020). But even favorable history and characteristics of the defendant, including long ties to the community, cannot "overcome the sheer weight of the evidence against the defendant and the nature and seriousness of the danger posed by defendant's release in light of the full context of the charged offenses." *United States v. Nikolow*, 534 F. Supp. 2d 37, 39 (D.D.C. 2008). Indeed, this consideration factors into a court's analysis most heavily where charges are supported by scant or unreliable evidence, at one end of the spectrum—weighing against detention— or by overwhelming and reliable evidence, at the other end—weighing in favor of detention.

The weight of the evidence against the defendants strongly counsels detention. *First*, the volume of evidence against the defendants is staggering. Much of the evidence is documented in the Criminal Complaint. Evidence of the defendants' criminal conduct includes photographs of physical evidence such as a drone recovered in the DRC at the time of the Armed Coup Attack, and emails, social media messages, explosive devices, and recordings made by the defendants engaging in planning efforts.

*Second*, the evidence supporting the charged crimes against the defendants is reliable because it consists principally of the defendants' own recorded statements: recorded videos that they took at MOESSER's residence in Utah and in Africa while

scouting attack sites; photos and videos that they posted on their social media pages; and a recorded post-arrest interview with MOESSER. It also consists of physical evidence, such as a photograph of the weapons, drone, and resources recovered by the DRC in responding to the Armed Coup Attack, and which matches a drone and resources that the defendants procured in the United States. Moreover, MALANGA livestreamed the Armed Coup Attack on social media; these recordings contain audio in which someone can be heard being shot during the Armed Coup Attack. Additionally, evidence includes written communications among the defendants and coconspirators, which consists of the defendants' own statements.

*Third*, the foregoing evidence is corroborated by MOESSER's post-arrest recorded interview in which he made incriminating statements, and by the incriminating evidence seized pursuant to a search warrant executed at MOESSER's residence in Utah and returns from legal process. In a post-arrest interview, MOESSER admitted to his involvement in the conspiracy, and that he intended to be a sniper in the Armed Coup Attack. In a post-arrest search, federal agents found a wealth of additional corroborating evidence at MOESSER's premises: a box of explosive components that MOESSER had hidden after preparing the components for use in the Armed Coup Attack, and the sniper rifle that MOESSER intended to use during the Armed Coup Attack. Further, email and social media communications are corroborated by videos that the defendants took when planning and preparing for the Armed Coup Attack, as well as by witness testimony.

In summary, the weight of the evidence against the defendants is both reliable and strong, and this factor supports the defendants' pre-trial detention. *See United States v.*

*Tortora*, 922 F.2d 880, 886 (1st Cir. 1990) (finding that "evidence of [defendant's] guilt is both substantial and credible" because the prosecution "is based in large part on direct evidence, including tape recordings").

###    D.    The History and Characteristics of Each Defendant Weigh in Favor of Detention

The history and characteristics of the defendants also weigh in favor of detention, and at minimum do not weigh in favor of release.

####        *1.    Marcel Malanga*

The United States is not aware that MALANGA has any relevant criminal history. However, MALANGA has no current employment, and he has been unemployed for at least a year while he has been in Africa. MALANGA does not have long-term employment that could motivate him to stay in Utah, and as such his flight risk is high.

Further, MALANGA has no stable place of residence either and, as such, poses a flight risk. MALANGA had no stable housing prior to leaving for Africa in April 2024, to engage in the Armed Coup Attack. MALANGA's biological mother had requested that he leave her house prior to the April 2024 trip due to a disagreement between the MALANGA and his mother. And before this disagreement, MALANGA lived with his mother only from 2023. Before this time, MALANGA had very little contact with his mother and lived away from her. Prior to leaving for Africa, MALANGA had been living in THOMPSON's bedroom.

MALANGA has family ties in Utah. However, none of MALANGA's friends or family members that live in Utah and who were interviewed by federal agents could

prevent him from engaging in the conduct charged here: planning and carrying out the Armed Coup Attack, though several indicated that they were concerned for him. MALANGA has a brother who lives out of this District, and MALANGA may flee to the state of his brother's residence. Moreover, MALANGA's stepmother and stepfamily still live in Africa. He has visited them with some regularity in the past. And he could easily be motivated to flee to Africa to live with them and avoid criminal prosecution in the United States.

As such, none of MALANGA's background, history, or characteristics weighs in favor of his release.

### 2.    *Tyler Thompson*

The United States is not aware at this time that THOMPSON has any relevant criminal history. THOMPSON has no current employment and has been unemployed for at least a year while he has been in Africa.

While THOMPSON has family ties to the community, those ties were wholly unsuccessful at preventing him from planning and preparing for the Armed Coup Attack while he was living with his mother in Utah. Members of THOMPSON's family told federal agents that they were not at all aware of his criminal activity, and they have even very recently denied that THOMPSON was involved in a crime. Members of THOMPSON's family indicated that they are unaware that THOMPSON engaged in any specific planning and preparatory acts that he conducted from his mother's house in Utah. Similarly to the period before THOMPSON left for Africa in April 2024 to engage in the

Armed Coup Attack, THOMPSON's friends and family would not be effective at preventing THOMPSON from engaging in further criminal activity or from fleeing from justice if he were released.

The United States is also aware from THOMPSON's family members and friends that THOMPSON maintained a very small social circle and did not have a wide network of friends. These factors suggest that THOMPSON poses a flight risk.

> 3. *Benjamin Zalman-Polun*

Regarding criminal history, POLUN was arrested for conspiracy to possess marijuana with intent to distribute in November 2013 and November 2014 and sentenced to ten days' imprisonment.

POLUN has very few ties to Utah. Rather, POLUN has strong ties to countries in Africa and elsewhere, enabling him to more easily flee this District. Since 2014, POLUN has lived in, among other places, Washington, D.C.; Manassas, Virginia; London, England; Belgium; Republic of Georgia; Senegal; and Eswatini, Africa. Most recently, POLUN maintained a residence with his family in Eswatini for years. POLUN has a keen awareness of how to move, work, and live abroad, and he has maintained business associates and connections in various countries. Further, POLUN has strong ties to Christian Malanga's family in Africa, with one individual describing POLUN's relationship to Christian Malanga as their being like brothers and a part of the same family. POLUN has a family member who lives in Washington, D.C. POLUN has no family in Utah.

Moreover, POLUN has no steady or regular employment, and he has not had regular employment for years. POLUN maintained odd jobs and at times was unemployed prior to

planning and participating in the Armed Coup Attack. He regularly received money from Christian Malanga and the Malanga family to cover his and his family's living expenses in Africa, as he had no steady income. POLUN certainly does not have a job here in Utah that would give him pause in deciding to flee this jurisdiction.

POLUN's background, history, or characteristics indicate that he poses a substantial flight risk that could not be mitigated. These factors militate against his release.

### 4.    Joseph Peter Moesser

With regard to criminal history, MOESSER was charged in 2009 and pled guilty to a charge for underlying conduct that is similar in some respects to his conduct here. On November 4, 2009, a grand jury sitting in the District of Utah returned an Indictment charging MOESSER with the following: 49 U.S.C. § 46505(b)(3) (Attempted Placement of Explosive on Aircraft); 18 U.S.C. § 844(g)(1) (Possession of Explosive at Airport); 49 U.S.C. § 46312 (Unlawful Transportation of Hazardous Material in Air Commerce); and 18 U.S.C. 1001 (False Statements). *See* Indictment, ECF No. 1, *United States v. Moesser*, Case No. 09-cr-00842-TS (D. Utah). According to the Indictment, these charges were based on an allegation that MOESSER attempted to place an explosive, specifically, an inorganic nitrate-based explosive smokeless powder for small arms, commonly known as black powder, on an aircraft departing from the Salt Lake City International Airport to Atlanta, Georgia, and then to Johannesburg, South Africa. *Id*. In a Superseding Indictment, on June 30, 2010, a grand jury sitting in the District of Utah charged MOESSER with the following: 49 U.S.C. § 46312 (Unlawful Transportation of Hazardous Material in Air Commerce); 49 U.S.C. § 5124 (Criminal Violation of Hazardous Material Transportation

Regulations; and 18 U.S.C. 1001 (False Statements). *See* Superseding Indictment, ECF No. 36, *United States v. Moesser*, Case No. 09-cr-00842-TS (D. Utah). This Superseding Indictment contains allegations about MOESSER's underlying conduct and allegations of false statements to federal officers. *Id*.

After the filing of a Superseding Misdemeanor Information charging a violation of 18 U.S.C. § 1036(a)(4) (Entry by False Pretenses to the Secure Area of an Airport), on April 15, 2011, the United States moved to dismiss the Indictment, and MOESSER pled guilty to the Information. Superseding Misdemeanor Information, ECF No. 80, *United States v. Moesser*, Case No. 09-cr-00842-TS (D. Utah); *see also* Plea and Sentence, ECF No. 82, Case No. 09-cr-00842-TS. MOESSER was sentenced to a term of probation. ECF No 82. Additionally, MOESSER was convicted for reckless driving, driving under the influence, and carrying a prohibited weapon in 2013, and was sentenced to six months in prison.

MOESSER has no steady employment; he sold his business(es) in Utah. He travels regularly to Africa and has presumably developed a network of associates and friends in Africa.

MOESSER lives with his spouse. However, family members, friends, and associates appear to have known about some of his criminal activities leading up to the Armed Coup Attack. For instance, MOESSER told federal agents that he had one of the drones used in the Armed Coup Attack on his kitchen table for up to week. Presumably, his spouse would have seen the drone. Further, MOESSER told federal agents that he talked with a neighbor about fusing systems and the drone delivery of pipe bombs. Last, the evidence indicates

that MOESSER met with the other defendants and with coconspirators at his house in Utah to instruct them on the use of explosives and destructive devices in furtherance of the Armed Coup Attack. Yet none of MOESSER's family members, friends, neighbors, or associates managed to dissuade him from further criminal conduct, and none reported MOESSER's activities to law enforcement.

>    5.    *Summary*

The history and characteristics of each defendant weigh in favor of detention. Nevertheless, if the Court were to find that this factor weighs in favor of release of any of the defendants due to ties to the community, such as with MALANGA, THOMPSON, and MOESSER; friends and family in the area; and lack of significant criminal history, these characteristics fail to overcome the strength of the factors reflecting the defendants' dangerousness and the serious nature of the offenses charged. *See United States v. Hir*, 517 F.3d 1081, 1091 (9th Cir. 2008). Indeed, the *Hir* court explained that "[w]e conclude that [the defendant's] history as a law-abiding citizen and his significant ties to the local community do not outweigh the extremely serious nature of the offenses with which he is charged, including his willingness to provide dangerous materials for use against civilians, while attempting to disguise his role in the affair, the weight of the evidence against him, and the nature and gravity of the danger that would be posed by his release." *Id.*; *see also United States v. Al-Arian*, 280 F. Supp. 2d 1345, 1355–56 (M.D. Fla. 2003) (describing defendants as "prominent leaders and models of civic involvement in their respective communities" but that these positive characteristics were outweighed by the charges of showing various violent crimes and providing material support to a designated terrorist

organization and thus holding that they "pose[d] a danger to the community"); *United States v. Goba*, 240 F.Supp.2d 242, 257-58 (W.D.N.Y. 2003) (finding that "each individual defendant's background [including long ties to the community, friends and family living in the area, and no significant criminal history] is significantly outweighed by the . . . danger to the community that each poses as a result of . . . his attendance and training at al-Qaeda's al-Farooq terrorist training camp [*i.e.*, dangerousness].").

Consequently, this factor cannot support a finding in favor of release for any of the defendants based on the facts here.

## III.    THERE ARE NO CONDITIONS OR COMBINATION OF CONDITIONS THAT WILL ASSURE DEFENDANTS' APPEARANCE

Any conditions of release not only must reasonably assure the appearance of the defendants at trial, but they must also reasonably assure the safety of the community. *United States v. Rodriguez*, 950 F.2d 85, 89 (2d Cir. 1991) (reversing district court's release order because it did not reasonably assure the safety of the community). Federal agents have interviewed multiple friends and close family members of the defendants. Many of those friends and family members have told federal agents that they had absolutely no knowledge or awareness that the defendants were planning the Armed Coup Attack, a period of preparation and planning that dated to mid-2023 and often involved residences at which the defendants lived in Utah. For example, THOMPSON's mother, with whom he lived prior to leaving for Africa, told federal agents that she had no idea what THOMPSON was actually planning. Her lack of awareness reflects that THOMPSON, and MALANGA, who lived with THOMPSON's mother for a period, may have adeptly hidden

their activities from certain family members. In fact, THOMPSON's mother told federal agents that, while THOMPSON shared many parts of his life with her and had regular contact with her, THOMPSON was an adult and did not share everything with her.

Similarly, THOMPSON's brother told federal agents that he had no idea THOMPSON or MALANGA were planning the Armed Coup Attack, despite living in the same house with them and being asked to purchase items for MALANGA and THOMPSON. THOMPSON and MALANGA, according to these witnesses, were successful in concealing their criminal enterprise.

In other cases, MALANGA did disclose, at least in part, his plans to some of his friends. Even with this knowledge, the United States is not aware of any friends who tried to stop him, or were successful at stopping MALANGA or THOMPSON, from departing for Africa and engaging in the Armed Coup Attack.

Likewise, POLUN was successful at concealing information from his family about the planning and attack. In MOESSER's case, MOESSER lives with his spouse in a house in Utah. In preparation for the Armed Coup Attack, MOESSER procured components for explosives and provided instruction and training to the defendants and coconspirators on components, explosives, weapons, and destructive devices at his house in Utah. Yet no one reported his criminal activities to legal authorities.

Additionally, news media have reported that the defendants have maintained that they were forced to participate in the Armed Coup Attack by Christian Malanga. News reports indicate that, throughout the trial in the DRC, the defendants repeatedly asserted that they only participated in the Armed Coup Attack under duress. MALANGA reportedly

26

stated at the trial that "Dad had threatened to kill us if we did not follow his orders."[2]
THOMPSON reportedly alleged that Christian Malanga woke him up on the night of the
Armed Coup Attack and threatened him at gunpoint.[3] THOMPSON reportedly stated
during the DRC trial that, "[h]e had not said anything about any of this happening until that
night."[4] He further told the court, "[t]o my knowledge we were here on vacation to meet
him, so I did not see him as a threat. The only thing he told me is that I must do everything
as he says or else I will die."[5] Yet, as described in the criminal complaint, THOMPSON's
conduct and actions in Utah and in Africa beginning from months prior to the Armed Coup
Attack contravene these assertions of duress. For instance, THOMPSON's internet activity
days and weeks prior to the Armed Coup Attack show THOMPSON conducting searches
for: 1) "condor concussion grenade," 2) "cheap ak47 stock," 3) "body armor plates for sale
near me," and 4) "ak47 bullets."

The evidence is overwhelming that all four of the defendants willingly planned and
carried out the Armed Coup Attack. The defendants did not participate under duress, and
they were not forced to participate by Christian Malanga, who was not even in the United
States during the defendants' preparation and planning in Utah and other districts in the
United States. Because these defendants appear to deny any culpability with their friends

---

[2] https://www.fox13now.com/news/local-news/northern-utah/the-lawyer-for-3-americans-facing-a-death-sentence-over-congo-coup-attempt-files-appeal

[3] https://www.npr.org/2024/09/13/nx-s1-5111628/3-americans-sentenced-to-death-in-failed-coup-attempt-trial-in-drc

[4] *Id.*

[5] *Id.*

and family about their involvement, there is no evidence to suggest that the defendants would be truthful about being able to abide by any release condition this Court could impose.

Moreover, MOESSER has successfully remained at large for nearly a year, concealing his involvement in the conspiracy during this time. MOESSER took affirmative steps to conceal the fruits of the crime by trying to hide the components for the destructive devices so they could not be found by law enforcement. And, during a post-arrest interview, MOESSER lied to federal agents, stating that he had destroyed the components for explosive devices. Pursuant to a search warrant, federal agents later found the components hidden in MOESSER's backyard.

Ultimately, there are no conditions that could reasonably assure the appearance of the defendants at trial and assure the safety of the community. The defendants have demonstrated that they were able to successfully conceal the nature of the criminal enterprise. None of the traditional conditions could successfully mitigate the risk of the serious danger to the community that the defendants pose or their risk of flight from this District.

//

//

//

## **<u>CONCLUSION</u>**

For all the reasons contained in this Motion, the Court should detain all four defendants pending trial.


DATED this 9th day of April, 2025.

Respectfully Submitted,


FELICE JOHN VITI
Acting United States Attorney


*/s/ Bryan R. Whittaker*                           */s/ Tanya Senanayake*
BRYAN R. WHITTAKER                      TANYA SENANAYAKE
Assistant U.S. Attorney                          Trial Attorney, Counterterrorism Section
Chief, National Security & Cybercrimes      National Security Division
Section                                                    U.S. Department of Justice

JONATHAN STOWERS
Assistant U.S. Attorney